## Biggs v. Commonwealth.

(Decided November 21, 1912.)

## Appeal from Clay Circuit Court.

Dying Declarations—When Statements Not Admissible As—Homi-
cide.—Where it appears that the deceased, at the time he made
the statements offered as his dying declaration, expressed any
hope of recovery or used any words indicating that he had not
surrendered all expectation of living, his statements are not ad-
missible as a dying declaration, although the declarant may have
been fatally wounded and death may have ensued shortly after
the statements were made.

H. C. FAULKNER, RAWLINGS & WRIGHT and A. B. HAMP-
TON for appellant.

JAMES GARNETT, Attorney General and M. M. LOGAN, Assist-
ant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

D. G. Barrett, Geo. Gibson and the appellant, James
Biggs, were jointly indicted for the murder of Perry
Combs. The indictment contains several counts charging
the accused in different forms with the commission of the
offense, and in one count with having conspired and con-
federated to kill Combs. The appellant, Biggs, was tried
separately under the indictment and found guilty of mur-
der, his punishment being fixed at life imprisonment. He
asks a reversal upon two grounds: first, because the
court erred in instructing the jury upon the subject of
conspiracy; and, second, for error committed in admit-
ting as evidence the dying declaration of the deceased.
As the case must be reversed, and there will be a re-trial,
we will only relate so much of the evidence as is neces-
sary to understand the grounds relied on for reversal.

Biggs, Barrett and Gibson are related by marriage,
and in December, 1911, lived near together on Teges
Creek, in Clay County. On Christmas day, 1911, the de-
ceased, Perry Combs, Ben Felty, and perhaps one or two
others, all of whom had been drinking, and were at least
to some extent under the influence of liquor, were riding
together, and when they came about dusk to the house of
Barrett, which seems to be situated close to the road, they
commenced firing off their pistols, and, in other ways,
acting in a disorderly manner. While they were thus

conducting themselves at or near Barrett's house, Biggs and Gibson appeared and took some part in the shooting, but in this "shooting," as some of the witnesses call it, no one was hurt, and after several shots had been fired Combs and his companions rode on their way. A little while after they left, Gibson and Biggs went to the home of Biggs, and after remaining there probably an hour or two they again went to Barrett's house, and were there between eight and nine o'clock in the evening, when Combs and Felty returned.

It is the theory of the Commonwealth, and there is evidence to support it, that Biggs, Gibson and Barrett knew, or had reason to believe, that Combs would come by Barrett's house some time during the evening or night, and that they assembled there for the purpose of attacking him when he came, and it is upon this theory that the court properly instructed the jury upon the subject of conspiracy. When Combs and Felty arrived at Barrett's house Combs called Barrett out of the house and told him that he wanted to apologize for his bad conduct earlier in the evening. While Barrett and Combs were talking Biggs came out of the house, or from some place in the immediate vicinity of the house, and when he made his appearance a conversation in its inception apparently friendly at once began between Biggs and Combs, in the course of which Combs handed Biggs a bottle of whiskey and Biggs took a drink out of it. Up to this point there is little dispute between the witnesses for the Commonwealth and the defense.

Felty for the Commonwealth testified in substance that when Biggs handed back the bottle to Combs, and while he was putting the bottle in his overcoat pocket, Biggs shot him without excuse or provocation.

While Biggs says in substance "that when he handed Combs back the bottle Combs said, Jim, you shot this evening, and I said, what did you do, and he says, By God, you shot this evening, and as this come out he went into his right overcoat pocket, and as he brought his hand out I discovered his pistol, and I hollered, hold, at him, and went for mine. I had my pistol in my right hip pocket, and I went for mine and he come on with his pistol, and it was all done in a short space of time, and as I come with mine I come as quick as I possibly could, and we both fired at the same time, a few other shots also being fired by each of us."

One of the shots fired by Biggs hit Combs in a vital part of the body, and from the effects of the wound he died the next afternoon about four o'clock, and a few hours before he died made a dying declaration, which was in substance the same as the evidence of Felty. If the evidence of Biggs is true, and his testimony was fully corroborated by Barrett and Gibson, he shot Combs in self-defense. On the other hand, if the evidence of Felty is true he shot Combs without excuse or provocation and his killing was murder.

With Felty the only eye witness to the affair who testified for the Commonwealth, flatly contradicted upon every material point by Biggs, Barrett and Gibson, it is of course manifest that the dying declaration of Combs, supporting as it did the evidence of Felty, was very material evidence for the Commonwealth, and there can be no doubt that its admission prejudiced in the highest degree the substantial rights of the accused if it was not competent evidence. The competency of this dying declaration is assailed upon the ground that at the time it was made Combs hoped or believed that he would not die. Several witnesses who were present when he made the statements admitted as the dying declaration, and which were testified to by them, said that although he declared a number of times before making the statements that "he was killed," that "he would die," that "he could not live," he also said after making the statements when asked if he had abandoned all hope of recovery that "he might get well but that he doubted it," "he had a little hope," "yes, I have some hope," "he hoped he would get well."

The admission of dying declarations as evidence is one of the well recognized exceptions to the rule excluding hearsay evidence, and the ground upon which this exception is based is thus stated by Greenleaf on Evidence, vol. 1, sec. 156-158: "That they are declarations made in extremity when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth. A situation so awful and so solemn is considered by the law as creating an obligation equal to that which is imposed by positive oath in a court of justice. * * * It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering

them in evidence, that they were made under a sense of impending death, but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind. * * * It is the impression of almost immediate dissolution, and not the rapid succession of death, in point or fact, that renders the testimony admissible. Therefore, where it apears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued in an hour afterwards, the declaration is inadmissible.''

This statement of the law has been adopted, so far as our investigation goes, not only by this court but by all other courts of last resort. Indeed we do not know any rule of evidence that has been more uniformly adhered to and more generally accepted as sound than this. Measured by this test of admissibility the statements of Combs were not competent. It is true Combs was fatally wounded and that his death ensued in a few hours after he made the statements referred to, but it is also shown, without contradiction, that when he made these statements he had not given up all hope of living, and it is the expectancy of recovery to which he gave expression that renders his statements inadmissible.

In many particulars, not necessary to notice in this opinion because not pertinent to the precise point under consideration, the original rule admitting dying declarations as evidence has been enlarged by judicial construction, but the rule that statements are not admissible as dying declarations when the declarant expressed the hope or belief that he might recover, or indicated by some words that he had not surrendered all hope of recovery, after the statements offered as a dying declaration were made, has never been modified or departed from. Peoples v. Commonwealth 87 Ky., 487; Pace v. Commonwealth, 89 Ky., 204; Commonwealth v. Matthews, 89 Ky., 287; Arnett v. Commonwealth, 114 Ky., 591; Commonwealth v. Griffith, 149 Ky., 405.

For the error in admitting this evidence the judgment is reversed, with directions for a new trial in conformity with this opinion. ·